DRAFT: 11/21/2014 6:42 PM

George F. Carpinello, Esq.
Adam R. Shaw, Esq.
BOIES, SCHILLER & FLEXNER LLP
30 South Pearl Street
Albany, NY  12207
(518) 434-0600

Charles Juntikka, Esq.
CHARLES JUNTIKKA & ASSOCIATES LLP
1250 Broadway, 24th Floor
New York, NY  10001
(212) 315-3755

*Attorneys for Plaintiff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Nyree Belton,<br><br>        Debtor, | |
| Nyree Belton,<br><br>        Debtor and Plaintiff on Behalf of Herself and All Others Similarly Situated,<br><br>    v.<br><br>GE Capital Consumer Lending, Inc. a/k/a GE Money Bank,<br><br>        Defendant. | Chapter 7<br>Case No. 12-23037 (RDD)<br><br>Adv. Proc. No. 14-08223 (RDD) |

## DECLARATION OF DEAN BINDER

I, **Dean Binder**, declare that:

1. I have been retained to provide an opinion in connection with Defendant GE Capital Consumer Lending, Inc.'s (hereinafter "GE Capital") motion for a stay pending appeal of the decision of its motion to stay the action in favor of arbitration.

## EXPERT BACKGROUND AND QUALIFICATIONS

2. I have worked in consumer credit, consumer credit reporting and consumer credit scoring industries for over 20 years.

3. From 1991 to 1997, I was employed by Equifax Credit Information Services. I spent most of those years in various roles, including as a Quality Assurance Specialist, as a Maintenance Operator and as an Assistant Manager of a team of consumer service agents, which handled thousands of consumer contacts (both by telephone and mail) on a daily basis.

4. As one of the Equifax Team Leaders, I managed the Fraud Investigation Team functions, including the reinvestigation process and adherence to productivity and quality expectations. I worked closely with fraud victims to determine the accuracy and validity of their consumer claims.

5. As a Quality Assurance Specialist, I was responsible for checking the accuracy and integrity of specialty teams such as Consumer Fraud Victims, Mixed Credit Files, Credit Repair Clinics, disputes and CDV processing (Consumer Dispute Verification Forms). This included listening in on consumer calls, sampling the dispute input of service agents and grading the adherence to company policy with respect to the accuracy of each of the dispute events, including call scripting as needed. I followed up with team members and delivered feedback for training purposes.

6. As a Maintenance Operator, I logged investigation results into Equifax's main

1

database as instructed by the data furnisher. I also performed other roles specific to consumer disputes such as Dispute Analyst, Information Consultant and Verification Processor.

7. In addition to my consumer experience at Equifax, I also worked with customers (data furnishers, purchasers and users of Equifax credit data and credit scores) at the Small Business Sales Division selling Equifax products and services.

8. From 2001 to 2008, I was employed by the Fair Isaac Corporation. Fair Isaac is best known for their work in credit risk score development. Their core product, the "FICO" Credit Score, is widely known in the consumer credit and lending environment and is by far the dominant credit risk score used in those industries.

9. My time at Fair Isaac was spent in the Mid Markets Account Management and Sales Division. I was responsible for new customer and renewal sales for a suite of Fair Isaac loan origination products, including web-based credit decisioning, application processing software and custom scorecards, including those specific to home equity, revolving, indirect and direct lending.

10. I also participated in a collection of credit bureau score trainings, both internal and external to Fair Isaac, relating to score development, implementation, calibration and validation.

11. In addition to my time at Equifax and Fair Isaac, I worked as Finance and Insurance Manager at Morgan from 1997 to 1998. I was responsible for working directly with lenders to secure financing for consumers purchasing large ticket recreational vehicles. My duties included pulling and analyzing credit reports and FICO scores, matching applicant credit risk with the most appropriate loan product given the consumer's credit history and score. I then executed the final sales and finance contracts between the consumer and lender.

12. I have also served as a credit expert for a personal finance website called

2

Filife.com. FiLife was an IAC/Dow Jones joint venture. By invitation, I served as a credit and credit score blogger for the New York Times. In addition, I am FCRA Certified.

13. Because of my work at Fair Isaac and Equifax, I am well-versed on credit scoring, scoring analysis and the use of credit scoring and credit models in the financial services industry.

### GE CAPITAL'S PROPOSED DELETION AND REDESIGNATION WILL HAVE A SEVERE ADVERSE EFFECT UPON THE MEMBERS OF THE PUTATIVE CLASS IN THIS ACTION.

14. I understand that, as a condition for a stay pending appeal of GE Capital's denial of its motion to stay in favor of arbitration, GE Capital proposes to delete tradelines of debts that were discharged in bankruptcy while its appeal is pending. However, GE intends to reinstate these tradelines as "charged off" at the end of its appeal, whether it wins its appeal or not.

15. The re-imposition of a tradeline as "charged off" will have a significant and immediate adverse effect on the credit worthiness of the class. I have conducted a simulation that represents the effect on a FICO score of an average hypothetical individual, if certain tradelines are deleted or inserted. The simulation score model is supplied by FICO itself and is publicly available. In applying this model, I assumed a hypothetical consumer who had charged off debt with a zero balance that became delinquent in 2012 and was sold in that year. I further assume that the consumer filed bankruptcy in 2013 and that the debt was discharged in that year. I further assume that GE Capital removes the charge off for the discharged debt in 2014 and reinstates the charge off in 2017.

16. Without the re-imposition of the charge off and assuming no other delinquent tradelines, all other scoring variables being kept the same, this individual would have a credit score of 690-740 or a median credit score of 715 in 2017. If, however, the 2012 charge off is placed back on that person's credit reports in 2017, his score would drop to a range of 650-700

3

or a median score of 675 for a net negative difference of 40 points.

    I hereby declare under penalties of perjury that the foregoing is true and correct.

Dated: Buford, Georgia
      November 21, 2014

_____
Dean Binder

S:\wpdata\7545001\Belton 002\Work Product\2014-11-17 Declaration of Dean Binder CL.docx